Good afternoon, Your Honor. Counsel. Mr. Lyons, please, the Court. My name is Bob Storrs, and I represent the appellant cross-appellee Max Tanner. Would you please speak up, Counselor? Thank you. Yes, ma'am. I will. Thank you. I'd like to just hit a few points. There are a number of arguments in this case. The first one, it has to do with the intangible right of honest services. And one of the primary cases that the government relies upon as to why it shouldn't apply in this case and why there shouldn't be error is United States v. Sir, which is cited in the briefs. That case is clearly distinguishable to this situation because if the Court will look at that case and the jury instructions that were specifically given in that case, there was, in fact, some limitation on what intangible services of the right to honest services actually meant in that situation, and the jury had to make those findings. Counsel, help me on something that confused me with the briefs on both sides. I don't understand, well, two things about this issue. One is why the government even needed the honest services part of the indictment. This is fraud for money, and they could have just charged it as money. And the other thing I don't understand is why either side thinks that the government needs a fiduciary relationship. A fiduciary has a higher duty, but even people in non-fiduciary relationships have a duty not to lie in order to induce somebody to part with his money. And if Tanner is an accessory before the fact or an aider and abetter in causing the brokers to lie to the customers in order to get the customers to invest in the stock, it seems like that's fine for depriving the customers of the honest services of the brokers, even if the brokers do not have a fiduciary duty. What am I missing here? First of all, I don't know why the government alleged it. Actually, it doesn't make any sense to me. But the fact is that they did. And once they did, if you look at the cases, especially Sewer, it doesn't say that it has to be a fiduciary relationship in the technical legal sense of the term, but there has to be proven some duty between the broker and the customer. Well, all you need is a duty not to lie, though. I mean, suppose I go into one of the shops on the way home and I say, I want to buy a Hasselblad camera, really expensive, good camera. And the man at the shop hands me a camera and he says, here's a Hasselblad. That'll be, I don't know what they cost now, $3,000. And I buy it. He doesn't have a fiduciary duty to me. He has just the most limited arm's length commercial responsibility. But he still committed fraud. And if you're the person who was misbranding the cameras and making fake Hasselblads look like real Hasselblads, then you'd be an aider and a better. And, yeah, he has a duty to me, but it doesn't have to be anything special, just the duty not to palm off something. Well, except that I think that the courts have said in these situations, in the cases that we've talked about, that there has to be some kind of a duty established in order for the intangible right of interest. But I just gave you a duty. The duty not to lie in an ordinary commercial relationship. Why isn't that enough? Well, and it may very well be enough in this particular situation. The problem is that there wasn't any clarification or any direction to this jury on that issue. Excuse me, counsel. Oh. You get a minute to think about additional response, because I just discovered that the timer is not working. Oh, mine is. Is yours? Yeah. Oh, ours isn't. Well, I'm at 1623. Nothing's happening there. As long as you know. I'm kind of curious, too. I didn't touch it. You have no idea? Why don't we just do the best we can so we don't interrupt the argument? And why don't you get it fixed before tomorrow? Okay. Thanks. Sorry, counsel. That's okay. And really, unless you have another question on that point, I think that the case is distinguishable. The Sewer case talks about what the obligation is for defining this particular duty and obligation. Which case? Sewer. S-Z-U-R. United States v. Sewer. 289F3-2. I can't read my writing. 200, the Second Circuit case. It's set up in the briefs. The next point I'd like to talk about real briefly is Juror Brooks. And our position today on that is that, at the very least, Mr. Tanner was entitled to a right to a hearing. I don't see what the problem was. I read the questions, and it looked like every response the juror gave was true. If he had not been listening carefully, he might have said, well, you know, I once got approached by somebody. But if he was listening carefully, he would have given the responses he gave. Well, vore dire is to speak the truth. And what did he lie about? Well, it's not what he lied about. It's what he didn't disclose. And it was he asked where he didn't give an answer. He was asked if he had anything to do with any offshore. I don't think he was asked anything to do. I think it was different phrasing. Well, okay. And it's in the brief exactly what those questions are. And I can't tell you exactly what the series of questions were that were asked. They're there and they're discussed on both sides. But my point is, when you look at what this man said, what he said to Mr. Kamin was that he had been involved in a financial scam that involved a Kamin Island company. He didn't say he was involved. He said somebody tried to get him involved and he turned him down and he was real glad he did. Well, but he also said no. What he said was that he withdrew. He didn't withdraw. He didn't buy. No. We don't even know that. We don't know that. And then Mr. Kamin's affidavit said that what Mr. Brook told him was that he had withdrawn from the enterprise. And then Mr. Brook called the FBI and said, told him about it, and the FBI agent said that he had just gotten out in the nick of time. So he was involved in some way. Now, we don't know to what degree, but he said he had prior experience with the use of a Kamin Island company in a financial scam. He was approached to participate in a reinsurance business based in the Kamin Islands, the same islands involved in this case. Right. And he withdrew from the project. Once he began to see, quote, red flags, the persons involved in the deal continued to pursue him after he informed them that he did not want to participate. And he further, he called the FBI on the guise, and an agent informed him he was just getting out in the nick of time. And he added at least one of the businessmen involved had gone to prison due to his role in the deal. Now, what there raises any question about he was not he was a potential victim. He was not a victim, was he? Well, we don't know that. We don't know that. How was he a victim? Well, we don't know that he was a victim. We don't know whether he was a participant in some – maybe he was a co-conspirator. We don't know. But what he did say there was, though, that he was involved and that he withdrew. And the other – and then he was involved enough so that he saw red flags, and then that's because he withdrew. And the point is, whatever conclusions in Mr. Brooks's mind about the association and involvement of the Cayman Islands, I mean, he may be – I thought he was involved in a project, and somebody came to him with this, and he just didn't buy it. No. That's not – well, I – He was supposed to participate in a reinsurance business. Right. Paid in the Cayman Islands. Right. Judge Nelson just read the affidavit. And my reading of that affidavit is that he was involved. I think the question was, have you been employed with or had experience in the securities business or telemarketing business or any of the agencies that regulate the security industry? And I don't see where, in order to tell the truth, the juror would be called upon to talk about this time when he was approached. Well, I don't know. Reinsurance? It would seem to me that that would involve in some way government regulation and that if you're going to be involved in a reinsurance project, that that would be a reasonable response to disclose. If I've been listening to that question and I've been on the panel, I mean, I've been on panels where they're doing the voir dire, and they ask a question like that, I would understand it to be asking about my employment. Well, you know, and then that depends on how a person might define employment. But reinsurance wasn't an industry involved in this scheme, was it? No. It wasn't reinsurance. The scheme involved the brokerage industry but not reinsurance. That's correct. Why would you, if the question is, as Judge Kleinfeld read, why would you answer affirmatively based on the testimony that Judge Nelson read through? Well, because. Right now I'm not quite seeing it. Okay. In the introduction to voir dire, the judge explains to the jury what this case involves, and it involves an offshore corporation involving the Cayman Islands. But he wasn't questioned about have you ever been involved with any incident that involved the Caymans. He was questioned about the industries involved and his employment, I thought. Well, that's true. But he had, he, Brooks, had been involved in a business involving the Cayman Islands. He knew that this. Read the question back again. But Judge. How does the question. I have it right here if you wanted it. Have any of you had employment or experience with the securities business, brokerage, or telemarketing businesses or agencies that relate or that regulate such businesses as the Securities and Exchange Commission, the National Association of Security Dealers, or the stock exchanges? I don't see how even if he, if he had been like a, you know, tourist agent or a bank promoter for the Caymans, how that would necessarily come within that question. Well. To ask the other question that was asked by the Court, do any of you hold views or prejudices regarding persons who try to avoid taxes or flaws, which would interfere with your ability to be fair and impartial in this case? I suppose that might relate to the fact that he reported these guys. Right. When he saw the red flags. Right. And that it was the Cayman Islands. And those are the allegations here against Mr. Tanner, a tax evasion or tax avoidance by using an offshore island corporation. I mean, I think that if the spirit for Dyer is for people to be honest and tell what they know and what their experiences are, you can't inquire with someone about whether or not they have any preconceived ideas unless they tell you about what their experiences are. And in this situation, he had a bad experience involving the Cayman Islands. He knew this case, dealt with the Cayman Islands. I just don't get it. I mean, it would be nice if in Federal Court you had what we used to have in State Court where the lawyer gets to have a conversation with the juror, because that way you sort of sniff what is not being said and you can poke around and find out. But you don't get it in Federal Court usually. And I'm looking at this question. The question was, have any of you held or used offshore tax shelters, foreign banks or securities accounts? Do any of you hold views or prejudices regarding persons who try to avoid taxes or tax laws, which would interfere with your ability to be fair and impartial in this case? That's the question. Now, I'm thinking the question for us is, did this jury foreman lie when he didn't raise his hand and say yes and answer that? And I'm thinking, boy, if I was asked that, I'd understand it to mean, do I have any offshore accounts and do I have any feelings about tax avoidance that might make me less than impartial if somebody does have offshore accounts? And it would never occur to me to talk about the experience this guy had with somebody trying to palm off some reinsurance deal. And I respect your opinion. I can't figure out that I should call him a liar for not raising his hand on it. Well, he didn't disclose. He withheld information. And I don't know if he withheld it. He didn't disclose it. But if he wasn't asked, then it's not fair to say he withheld it. It's really kind of the question whether he was asked, because he's asked, have you been evicted of a fraud or a financial scam? But he's not asked, have you ever been on the periphery or did someone ever approach you about a scam where you weren't a victim? That's true. But we also know from the affidavit of Mr. Kamen that Mr. Brook was involved to some degree, to some extent, in the reinsurance situation. Unless there's another question on that point. The Court's ruling on that is in the excerpt of Record 912, 913. And the Court found that there was only a tangential relationship with another involving offshore schemes. His relationship with the company was tenuous at most. We basically have to call this guy a liar in order to grant relief on this point, don't we? Yeah. And I think he should have disclosed it. It was reasonably called for because of the combination of the fact that what he was being had to do with the Cayman Islands. And he himself had been involved with activity in the Cayman Islands that he thought was illegal and fraudulent and he himself withdrew from. You know, sometimes it's nice when you get to do your own voir dire to purposely be kind of vague and clumsy in your questions so that they're broader. These questions are real precise. And they don't ask, do you ever have anything to do with anything about the Cayman Islands the way you might have orally? But I think that that's being overly technical because isn't the real issue here to try and find out whether you have a fair and impartial jury? No. The real issue is to find out whether this juror lied. Well. You get to find out whether you have an impartial jury when you're doing the voir dire. We only get to reverse if this jury foreman lied. Well, and all I'm saying is that there ought to be a hearing. There are unanswered questions here. I concede there are unanswered questions, but questions that should be answered, that inquiries should be made. That's all we're asking for. All you're saying is there should be a hearing on whether or not, for instance, if he had revealed that he had deemings in the Cayman Islands, whether that might have been allow a challenge for cause. Right. Especially when you consider what the question that he sent to the judge and to counsel during the course of the trial when he said, once we finalize our deliberations, can we write a written opinion? And that was also discussed in the context of this with the court and counsel during the course of the trial. And the court should have inquired of him at that time exactly what he was talking about, because once he said, once we finalize it, that's a reasonable conclusion to that is he's already started to finalize, and he's already started to think about what his decision is. And that's in the middle of the trial. So when you have. I don't know if that's a reasonable. Isn't it? It's a reasonable interpretation. Okay. Once we finalize. But it depends on whether the guy thinks ahead or not. Well, that's true. But wouldn't you want to ask? I mean, what did you mean by that? Have you guys, the other jurors and yourself, been talking about the facts of this case? That's a question that opens further inquiry. Sir, what do you mean by that? Can you tell us, has there been any discussion about this? That's the least, I think, that should be done in that kind of a situation. What does the juror mean? Help me on another issue that's bothering me. Okay. On the government's cross-appeal. Okay. I don't really understand what the justifications are for the grouping that the court did and the downward departure, particularly the downward departure. How do we – I think we have to review that, De Novo, if Booker and Fan Fan don't upset the whole apple cart. Right. Right. And I'm wondering just what we're supposed to say. Okay. What I think is on the downward departure issue, what isn't part of the record, I don't think, I'm not sure, because it was sealed, so I don't know whether it's come up here or not, but the memorandum that was filed by Mr. Sun in regard to the departure and in regard to sentencing, and in that memorandum he set forth all of these various factors. And when Judge Dawson went through this, he said that there were a number of factors that were listed, not only discussed by Mr. Sun at the time immediately prior to the sentencing, but in that memorandum that was before the court and part of the record. And there were a lot of different things. There was age, the fact that he had previously been a law-abiding citizen, the effect of these convictions on his family, not that he was religious, but that he had been excommunicated from his church. There was discussion about the co-defendants and their fraudulent activities prior to this. And, of course, you can't exactly compare because, in fact, Mr. Agerio wasn't found guilty and didn't plead guilty to money laundering. So it doesn't exactly fall there. But then he did not use that as a specific basis for this. These were all things, none of which in and of themselves came together to warrant the groundward departure, but as a group did. So the loss of his professional career, the fact that the co-defendants had prior felony convictions or prior felony activities, his loss of his license to practice law. So there were all of these other factors that Judge Dawson sort of referred to in reference to this. And what should we say? Let's suppose that we wanted to affirm. Okay. And let's suppose that we could hire you to write that paragraph. What would it say? That paragraph would say that there's a combination of factors involving the age of Mr. Tanner, who was, what, 52 at the time that this occurred. He had been a lawyer for 20-some years, been a law-abiding, productive member of society. There had been a negative effect on his family. He had gone through a divorce. One of the other humiliations and negative impacts of all of this, that he had gotten excommunicated from his church. The co-defendants involved in this case had prior fraudulent criminal activity. That wasn't the case so far as Mr. Tanner was concerned. Other forms of punishment that Mr. Tanner received included the losing of his career as an attorney, involved in that loss of the practice of law, and then to whatever extent the court, for example, the bipolar disorder. The court said, you know, that in and of itself isn't a basis for departure, but I'm going to consider that. His abuse as a child, Mr. Tanner's abuse as a child, all of those things, this combination of about the seven or eight factors that I just made, this unique combination of factors that justifies a departure in this particular case, to take it outside of the heartland. And I think that, in fact, Judge Dawson did that. He just didn't articulate 1, 2, 3, 4, 5, 6. Is there another issue you want to or can I just reserve a couple minutes? I'm sort of vague on time. About two minutes ago I got a note from the clerk that you had two minutes left. So I think you just finished your time, but we'll probably give you a couple minutes on rebuttal. Thank you. Thank you. I plan for a minute or two of rebuttal. Okay. Could you keep passing notes to me that way? Because I keep thinking the person's four minutes, 59 seconds over. Thanks. What is the time supposed to be right now for the argument? May it please the Court. My name is Robert Lyons. I'm appearing on behalf of the United States in this appeal. Judges, I also asked the prosecutor why we added honest services to the indictment, because it raised all sorts of issues that I, as an appellate attorney, would prefer not to have to brief. And without getting into our particular conversation, I have to tell you I still don't know. So I don't have an answer for you. But I have to tell you I asked that question myself because of the issues that it raised. Counsel cited some Second Circuit case, SIR, with trying to distinguish it. And before we get to the Second Circuit cases, I did want to point out that the Ninth Circuit has cases that I think answer this question, and we don't really have to go to the Second Circuit law. The question being? Well, as to how far the honest services fraud in the mail-in fraud statute, how expansive is it? Does it apply to private honest services? And in this Court's decision in FREGA, F-R-E-G-A, cited on brief, 179 F-3rd, 793, pinpoint set 802, this Court held that 1346 overruled McNally's holding that the mail-in wire fraud statute did not reach honest services, so basically undid what the Supreme Court had done to McNally. And then I would point the Court to Bohannes, 628 F-2nd, 1167, and that's a 1980 case, where prior to McNally, the Court sustained a conviction based on honest services mail fraud conviction. So you take those two cases together, and basically this Court, prior to McNally, affirmed an honest services conviction on private action. And in FREGA, said those pre-McNally cases of the Circuit Court are still good law. All right. So I don't think you need to go to outside in that Circuit law to affirm the honest services portion of the conviction. There is an en banc Second Circuit case. I'm sorry. I think your backup argument is that most circuits say private as well as public is covered by honest services because the statute doesn't say any different. No. No circuit has – well, let me – courts do have some concern about how expansive honest services. I mean, you only have to look at the Second Circuit's en banc rebiki decision to see that, you know, we don't want this to be so expansive that it consumes private contract disputes. And then sort of case by case, right? Yes. And, you know, we don't have a private contract dispute here. I mean, you know, you could argue the fringes of the honest – you know, how far the honest services theory should be expanded. But in this case, we have telemarketing fraud with affirmative misrepresentations and material omissions of brokers who told their victims, called them up and said, we're not going to take a commission until you earn X percent profit, not telling them that they were already earning 70 percent kickback on every stock sold. So, you know, there are perhaps hard cases under the honest services theory, but this is not one of them. And, you know, I said I would cite this Court's Frege decision, the Pohannes, the Second Circuit's banc rebiki decision, which favorably cites the Sur decision cited by counsel, that, you know, there may be hard cases under the honest services cases, but this is not one of them. On the bias as to whether a hearing should be held. Could I ask you a question on that? Yes. If the affidavit of Mr. Kamen is correct, and that Foreman Brooks failed to respond completely, I hate to call him a liar, but failed to respond completely, if he had mentioned that he had had dealings in the Cayman Islands, could that have been a reason for a challenge for cause? No, and the district court expressly ruled that it would not, and that's Tanner's Excerpt of Records, Volume 4, page 913. The court ruled that it would not be. Because. No bias or prejudice. I mean, you have to find a juror that can't fairly decide the case. And the court said, well, even if this all occurred, this is not such a juror. You know, if they wanted to do their preemptory, you know, that would be one thing. But the judge expressed, you would have to overrule the judge's factual finding that he would not, that this juror should not have been excused or recused for cause. Well, I ask that, particularly in light of the question that the court asked, which is the one I keep coming back to. Do any of you hold views or prejudices regarding persons who try to avoid taxes or tax laws which would interfere with your ability to be fair and impartial? And, of course, Cayman Islands is well known to be a place where such things take place. And added to the fact that he, when he was about to be involved in this reinsurance thing, he saw the red flags, and I reported them to the feds. Would that not indicate that he had some feeling about transactions in the Cayman Islands? I don't think any more than any American citizen who knows about the Cayman Islands. Everybody knows the Cayman Islands is a tax haven. And, you know, I want to point out that this juror ---- I didn't know it was a tax haven particularly. I thought it was just kind of a general dirty money haven. Well, it's that because of one reason, in addition to secrecy, is because of low tax rates. So there will be more cooperation. Some transactions that are structured to involve the Cayman Islands are legitimate. Well, that's a great. And I'm not trying to ---- For some people to try to lower their taxes. So at least for me, I don't personally find knowledge of the Cayman Islands to be an incident to be per se evidence that someone would be too biased to serve as a juror in this case. May I point out also that this juror voluntarily contacted or voluntarily spoke with ---- I shouldn't say contacted. I don't know if I ---- But voluntarily spoke with defense counsel and gave this information. This wasn't information that defense counsel independently found dirty laundry on a juror. It was like defense counsel says, can I talk to you? And I would submit that if a juror had adverse feelings regarding the defendant, he would say, no, I don't want to talk to you guys. But he voluntarily talked to him and gave him the information. And defense attorneys sat on it for five months before raising it to the court. And I would submit that if this was a big deal, that the juror wouldn't have spoken to him, and the defense attorneys would have gone to the court the next day. I mean, this is an argument that they're adding to the pile, you know, and they brought it to the court's attention five months later. And I would point to Tanner's Excerpt to Record, Volume 3, 748, in support of that statement. With regard to there being a hearing, I would point to this Court's decision in Tracy v. Palmetter, 341 F. 3rd, 1037, 2003. And we did a 28-J on that. But the Court held that, you know, you don't have to have a hearing. The Court can consider certain factors, the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source. And, you know, I would submit that the judge considered all this and held. Is there a part of this case we have to hold for Booker and Fan Fan? That's correct, Judge. On the upward adjustment for organizer-leader, is that right? I agree with that. I would like to address the downward departure. I think it's pretty evident in the record that the Court based the downward departure on sentencing disparity with Ruggiero. What's the matter with that? If the way the guidelines come out, you see that a guy who is a much worse criminal than this defendant and was involved in the same scheme is only getting five to serve, and that just because of odd bounces in the guidelines, this defendant is getting a multiple of that, why isn't it reasonable for the judge to cut it down? I know we have cases that say disparity by itself is not a reason, but it isn't just by itself. Well, I would give you two reasons for that. One is, I mean, there's the en banc decision of this Court, Buenos Rodrigues 215 F. 3rd, 969, 2000. You know, this Court said that where they had, in fact, they had similar contact, but there were different charging decisions and defendants were, in fact, being convicted of different offenses. And this Court held en banc that, you know, they're not going to second-guess the prosecutor's charging decisions. I mean, under the guidelines, this Court held that unless the defendant used as a barometer is convicted of the exact same offenses, that it cannot be used as the barometer for sentencing disparity. That's a little bit different question. I mean, to me, it just, as a judge, it seems really funny to have this huge scheme of the sentencing guidelines that's designed to eliminate sentencing disparity, and then because of the odd bounces that occur in a complex scheme, in this case it causes sentencing disparity, so the judge irons it out. Well, I would submit that, I mean, I think the premise of your question is that Ruggiero was more culpable than Tanner in every respect, and I would disagree with that. Tanner was convicted of multiple tax crimes. The money laundering offenses were basically handled by Ruggiero. Ruggiero, I mean, Ruggiero and his company and his... The judge thought, as far as I can tell, that Ruggiero was the real professional criminal, and he was as much using Tanner as anything else, and that Tanner was much more exposed on all these crimes, but that Ruggiero was the real bad guy. Well, Ruggiero was a bad guy to the extent that he was previously involved in telemarketing fraud. I yield that. But Tanner was also, as soon as Tanner heard, you know, I'm not going to get paid my $150,000, and Ruggiero says, well, we can do a boiler room, Tanner's all over it. And also Tanner, especially, I really want to get to the money laundering aspect of this part, because Tanner introduced the boiler room guys to money laundering, which is what drove the sentencing guidelines in this case. If you remember on the brief, Tanner is persuading or telling the boiler room guys, like Taylor, for example, I think is his name, like how to launder money, and he is helping them open overseas accounts. Prior to Tanner's involvement, there's no indication that these guys, the boiler room guys, laundered money abroad in the Caymans or anywhere else. They did domestic boiler room operations. They do a deal with Tanner. Tanner introduces them to the Cayman Islands in money laundering. So I would submit to you that, yes, Ruggiero is a bad guy because he has all these prior boiler room transactions, but Tanner upped the ante with introducing these guys in this transaction and other transactions, the money laundering portion of the crimes at issue in this case. And truly, it was the money laundering aspects that drove the sentence in this case. Could you back up to the honest services issue? Yes, Judge. Just what sort of relationship, if any, do you need to sustain an indictment on that, assuming that you get past the private center application of deprivation of honest services issue? Let me sort that out to make it clear. One issue is can you even use deprivation of honest services when you're not talking about corruption of a public official? And the answer that a number of the cases give is yes, because the statute doesn't limit it to public officials. It just says deprivation of honest services. The next issue is, okay, it applies to persons other than public officials. Do they have to have some kind of special relationship to the victim? And you heard me feeling around for an answer to that with your adversary. I want to know what your answer is. The courts have a valid concern about honest services being so broadly interpreted that it, you know, not every contract dispute. You don't want to get ‑‑ I don't want to get somebody indicted for this form of corruption because they asked somebody to go out for a beer when they're getting paid by the hour. I mean, it's more, you know, does the action lie in tort as opposed to contract? I mean, that would be the first cutoff I would look at. You know, are we looking at a tortious action as opposed to a run‑of‑the‑mill contract action? And, you know, there are hard questions to be asked perhaps in some cases as to how far that should go. But, you know, telemarketing fraud is purely within the tortious aspect of this. Five minutes, 12, is that where we are? Very good. So, you know, the question is, like, in Rubicki, if I may go to the Second Circuit and Bonk decision, you know, they had a discussion of this issue. And they eventually held that, you know, if you have, you know, like a duty similar to what an employee owes to an employer, they didn't say you had to be an employee because the sur decision. And I would invite you to look at the sur decision because it's, you know, it is a boiler room operation and, you know, pretty, you know, factually pretty close. That's the Bear Stearns case. I'm sorry? The Bear Stearns case. Well, that's a different case, but that is also ‑‑ and what the Bear Stearns case is important, because it says, I mean, the counsel made this argument that the accounts were nondiscretionary and so there is less of an obligation by the broker as opposed to a discretionary account where the broker gets to buy and sell for the person's account on his own initiative as opposed to at the direction of the account holder. But what the Second Circuit said was even in a nondiscretionary account, when a broker is selling, you know, calls up his client and says, I want you to buy this stock, there is an obligation not to make material misrepresentations or material omissions. And the court held that failing to tell your client that you're making a 70% kickback is a breach. So, like I said, you know, there could ‑‑ I don't know if I want to get into ‑‑ I don't think I'm going to be able to tell you how far the honest services doctrine should go. I can tell you that this case is squarely in the middle of what every court of appeals has ever held is sufficient for an honest services conviction. Well, the prior courts of appeals have looked at this sort of charge by charge, that no one has made a big global rule about it, right? That's correct. If we had to articulate a rule, what do you think it ought to be? Well, I look at this circuit's decisions, and, you know, the earlier one was in the employee context. And I think the Rabicki decision, the Inbox decision, is well thought out, and I would look at the Surge decision, which is cited in the Rabicki decision. And, you know, the Second Circuit, being in New York, really finds a lot of these types of cases, especially telemarketing fraud. It doesn't really give us an articulation of a rule. It says we conclude that the statute is applied to the defendant's behavior and defines the offense with sufficient particularity. If a defendant would know. I'm asking you the same kind of question I asked your adversary. Suppose that you got to write the paragraph of the opinion and it came out your way. Could you dictate the paragraph? The standard is whether a defendant would know that his actions constituted wire and mail fraud. And as we say on brief, that the brokers, and Mr. Tanner's an eight-armed better, certainly knew that calling up victims over the phone and using the mails and wires in support of their falsely promoting a stock they knew to be worthless and failing to tell the recipients of the phone calls, the victims, that they were getting a 70 percent kickback, a person who does that has noticed that his actions constitute wire and mail fraud. I mean, again, this comes back to vagueness, and you go back to the standard of whether a statute is vague, and you look at it on the facts. Outside the First Amendment context, courts will look as to whether a statute is vague as applied, and as applied in this case, a telemarketing scheme, a person, a broker who does these things, knows that he's committing wire fraud and mail fraud. Could you chat for a moment on your cross appeal? I don't know if we have to hold that if we're holding the other one, but I'm not sure that we do. It is a large departure, but your opponent made a strong statement of reasons why the district court might have wanted to depart. So what's wrong with the argument that was presented? All right. Well, we first state that the sense of disparity is contrary to circuit law. I mean, it can't be based on Ruggiero because he was convicted of different crimes. I'm sorry, Judge, I didn't mean to interrupt you. I thought that your, you know, that appellant's counsel made a slightly different argument. Well, he added in his reply brief age, family circumstances, loss of career, loss of law license, and he lost his church membership. What's wrong with all that stuff? Well, it wasn't the basis on which the court granted the departure. It was raised for the first time on appeal in their second brief. Family, church membership is a prohibited factor, religion. Law license doesn't rise because he used his law license in furtherance of the crime. Membership in a church is prohibited as a factor, I suppose. But is the fact that someone, if they belong to a church, was tossed out of it? Well, religious affiliation, you know, I think that falls within the prohibition of religious affiliation. I thought what he was arguing is that he's been punished in a sense. He's lost something that he cared about. Well, I'm sure his wife punished him as well, but that doesn't mean that the government can't punish him. And I didn't mean to be glib in that regard, but, I mean, the government gets to exact its punishment. Whether the church kicks him out, you know, is separate. That's true, but that's really not the question. For me the question is can the judge take into account the fact that the person has already suffered more punishment from other sources than the government when he decides how much he should be punished by the government? And also on the disparity issue, it's not just that there's disparity. It's that the judge is saying that in this somewhat anomalous circumstance, the guidelines are producing more disparity rather than less because of unintended peculiarities. Well, the supposed unintended peculiarity is the fact that Tanner was sentenced largely by the money laundering guidelines. And as I stated earlier, you know, if you're ---- It's not just that. As I read the thing, the judge is thinking the more sophisticated criminal is getting the less sophisticated criminal to do the stuff that invites the more severe punishment, kind of like if three guys are going into some kind of dope deal and they persuade the dumb young fellow that doesn't know any better, you carry the gun. If money laundering ---- if the driving force behind the sentence was not money laundering, say there had been no money laundering, I might yield that a little bit. But I don't because the ---- and this gets sort of into our grouping issue, is that Tanner was sentenced solely on money laundering. All the other convictions did not increase his sentence at all. And I'll get to that in a minute. But I just want to point ---- The reason for that that when you group money laundering and fraud, you go with the one with the higher sentence. Well, that gets to the retroactivity of Amendment 634, which we submitted a 630 or a 28-J letter in which the panel of this Court has created an in-circuit conflict. And there's an unpublished decision of this circuit that appears to create an intra-circuit conflict as well. And my understanding is that the government has filed a ---- has been granted until January 6th to file a petition for rehearing in the Butler case. So, you know, you have two grouping issues in this case. One is the grouping of the money laundering with the fraud. Now, the second grouping issue, which is the basis of our appeal, is the grouping of the money laundering and the tax offenses. The fraud, as you notice, Judge, was subsumed in the money laundering count. So what our appeal is based on, our grouping appeal is based on, is the district judge's grouping of money laundering and tax. And the judge even got that wrong. I mean, he grouped under D. Well, under D, you've got to aggregate the loss, and he didn't do that. So now the defendants come in and say, well, we're not going to justify the judge's grouping based on D. Let's look at C. Well, that doesn't apply. And, again, this gets into whether 634 is retroactive and the fact that under old law, money laundering had a base potential level of 23 with some incremental increases depending on the amount laundered. Post-2000 and 2001 and later, money laundering is based on the amount of the fraud, and then there's some smaller amounts based on high money laundering amounts. So grouping under C is correct because it would otherwise be double counting. And this argument is on brief. And the Butler case goes against the government on this, what we submit is wrong and creates an inter-circuit conflict, and we would submit an intra-circuit conflict with an unpublished decision. So we're hoping that gets rectified. But I don't think that ---- What do I care about an unpublished decision? What's that? You said intra-circuit conflict with an unpublished decision. It seems like you just violated rules by trying to get us to decide a case on an unpublished decision. Well, if I may, may I rescind that statement so I don't get in trouble? Sure. Thank you. You're three minutes over time, incidentally. Unless the Court has any further questions. Thank you, counsel. Counsel? Just, unless you have any questions, there was just a couple of points that counsel made in regard to Tanner and his knowledge about the boiler room and in relationship with Mr. Ruggiero. And I think the record is clear here that he did not know about the boiler rooms. I can't hear you. Oh, that he did not, that Mr. Tanner did not know about the boiler rooms until sometime later. In fact, Mr. Taylor himself testified, and it's in the record and cited too in the briefs, didn't even realize himself that there was a boiler room operation until he went to New York and went to the Empire State Building and found it to exist. And if Mr. Taylor didn't know, who was more involved and more sophisticated in criminal activity, you can't reasonably assume that Mr. Tanner knew, who was in Las Vegas, Nevada. How else would he sell this puffed up phony stock? Well, you know, that's why these people came to him. It was their idea how to do it. He didn't know. The point is he did not know how that was done. And there's no indication that he'd ever been involved in that kind of activity before and that that's what Ruggiero, that was the service that Ruggiero offered to this particular scheme. It wasn't something that Mr. Tanner knew about. There's no evidence he was ever involved in any of that kind of activity before. And this has to do, I suppose, with the enhancement for role in the offense as well, because really Tanner didn't have control of five people. The boiler room activity was separate. I don't understand. Boiler room just means a bunch of people cold calling on the phone to sell things. That's the way a lot of perfectly legitimate stocks and bonds are sold, too. You just call it a boiler room when they're trying to palm off junk. When you've got stock like this made for a day or whatever it was called, you know it's junk from the get-go. It's not worth two cents. And if you're causing it to be sold for $10 or $12 a share, you know that people are being tricked out of their money. Calling it a boiler room, it's just really journalists and prosecutors' talk. We're selling junk. Well, and I agree with the semantics of that. Just like in the briefs, they talk about kickbacks. If you look at the record in this brief. Call it a commission if you don't want to call them dirty. Call it a kickback if you think it's dirty. Same thing. Well, but that's what the government did, and so the government continued to use the word kickback. Sure, they always do. Well, of course they do. They don't call something an association or a group. They call it a gang. Conspiracy, right. That doesn't carry any weight with me. But in this case, it hurts you that it doesn't carry any weight because he doesn't have to see the boiler room in operation in the Empire State Building to know that worthless stock is being palmed off on gullible victims for significant amounts of money. Well, you know, and I understand what you have just said, but I think it makes assumptions that the record doesn't support that Mr. Tanner actually knew or was informed about as to how this stock was going to be sold and what means and methods and what associations Mr. Ruggiero had about selling this stock and whether it was going to be a private placement to people he knew or whatever he was going to do because there isn't anything in this record that shows that Mr. Tanner knew that at the time that they formed this relationship to take care of this stock. Let me give you a hypothetical case. Maybe you'll be able to educate me out of this, my misimpression. I'm thinking, suppose I import a whole lot of cheap handbags that cost me 50 cents each from, I don't know, Hong Kong or Thailand or wherever they get them from these days, and I cause them to have some fancy high-fashion label, Louis Vuitton or Hermes or something, on the bags, and then I sell them to all these street vendors from Senegal who sell them to customers near Times Square. It seems to me that it's no defense to me, when I'm charged with all the offenses involved in palming off these handbags, to say, look, I don't know what the street vendors are telling their customers. I have nothing to do with whatever pitch they make to their customers because it can't be true. I have to know that I'm causing the street vendors to palm off these phony, mismarked handbags. Well, I would say that the comparison you make is not accurate in this particular situation because here, in fact, there was a reverse merger. There, in fact, was CFE Trucking that was a business that, in fact, did reverse merge into Maidaid and is still operating today. So the basic assumption that there was no value here is not correct, and, in fact, there was a shell corporation that was created by Mr. Tanner before he knew about Mr. Ruggiero. He was in the business of selling shell corporations to businesses that were in operation that wanted to do reverse mergers. It's a legitimate business, and, in fact, ultimately what happened here is CFE Trucking did reverse merge into Maidaid. So there really was something of value here. There was a business. The fact that some of the money was diverted and not used for proper purposes and that the scam occurred and people lost their money is what's being prosecuted. But was this a completely fictitious, nonexistent situation? No, it wasn't. There really was a legitimate shell corporation. There's nothing illegal in and of itself of selling shell corporations. They do it all the time so that companies can do reverse mergers into it. It's a legitimate business practice. And so this one went wrong and fraud occurred, but it's not the handbag that had no value and never had any value. Thank you, counsel. Thank you. Thank you. United States v. Tanner is submitted. Next is United States v. Evans. Thank you. Counsel. Please, the Court. In the Evans appeal, the government is appealing in order of granting Defendant Evans a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, and it's the government's position that the district court clearly and manifestly abuses discretion in granting the new trial. And I would like to sort of piggyback on prior counsel's discussion with regard to the fact that shell corporations for the purpose of selling these shells for use in a reverse merger. And what that means is that you have a private company that would like to go public but doesn't want to go through the time and expense of doing the paperwork itself to go public. They will purchase a shell corporation that is publicly traded and through the merger become itself the private corporation would be publicly quoted. And we cite on the Libra and LY. Another thing that can happen is you've got a privately held business and they'd like to cash out. Their kids don't want to take over their business and they're getting old. And the best way to cash out is to sell their own business into a larger business or into a shell that will take them public. The end result of the situation you just described is that the people, the current owners of the private corporation don't end up with all cash and not the stock of the publicly quoted. In the transactions that we have in Mayday and the 20 that they did previously, the private owners keep 90 percent of the publicly quoted company and 10 percent is dispersed among the individuals like Tanner and Evans in this case.
judges: Nelson, Kleinfeld, Gould